# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. MICHAEL TUCKER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 99-05654     Chris Craft, Judge**

**No. W2000-02220-CCA-R3-CD - Filed November 20, 2002**

The Shelby County Grand Jury indicted the Defendant for felony murder in the perpetration of a robbery, first degree premeditated murder, and especially aggravated robbery. Following a trial, at which the Defendant was tried with his co-defendant, a Shelby County jury convicted the Defendant of second degree murder. The Defendant now appeals his conviction as of right, arguing that insufficient evidence was presented to support his conviction, that the trial court supplied the jury with improper supplemental instructions, and that the trial court improperly commented on the evidence at trial. Concluding that sufficient evidence was presented to support the Defendant's conviction for second degree murder, that the trial court's supplemental instructions to the jury were proper, and that the trial court did not improperly comment on the evidence, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., filed a concurring opinion, and JOSEPH M. TIPTON, J. filed a dissenting opinion.

A C Wharton, Jr., Public Defender, and W. Mark Ward, Assistant Public Defender, Memphis, Tennessee (on appeal); and William L. Johnson, Memphis, Tennessee (at trial), for the Appellant, Michael Tucker.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; William L. Gibbons, District Attorney General; James Wax and Karen Cook, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## I. PROCEDURAL HISTORY

In May 1999, the Shelby County Grand Jury indicted the Defendant, Michael Tucker, and his co-defendant, Joseph Flake, for one count each of felony murder in the perpetration of a robbery, one count each of first degree premeditated murder, and one count each of especially aggravated

robbery.[1]  Their joint trial began on May 30, 1999.  At the conclusion of the State's proof, the trial court granted co-defendant Flake's motion for a judgment of acquittal as to the first degree premeditated murder charge.  At the conclusion of the trial, a Shelby County jury acquitted both co-defendant Flake and the Defendant of felony murder and of especially aggravated robbery.  However, the jury found the Defendant guilty of second degree murder.  On July 14, 2000, the trial court conducted a sentencing hearing and sentenced the Defendant as a Range I violent offender to twenty-five years' incarceration.  The Defendant now appeals his conviction, arguing that insufficient evidence was presented to support his conviction, that the trial court erred in instructing the jury, and that the trial court improperly commented on the evidence at trial.  Finding no error in the record, we affirm the Defendant's conviction on appeal.

## II.  FACTS

All charges in this case stem from the shooting death of Ainsworth Blackmon, Jr., on March 30, 1999.  At trial, Cora Blackmon testified that she was the victim's mother.  She stated that her son, whose nickname was "Junior Boy," was twenty-three years old at the time of his death.  She also testified that she was aware that prior to his death, her son had been involved in criminal activity for several years, specifically with such crimes as assaults, thefts and "drug dealing."

Mark Rewalt, an officer with the Memphis Police Department for fifteen years at the time of trial, testified that he was working with the Crime Scene Unit at the time of the crime in this case. He stated that on March 30, 1999, he was called to a "shooting" at a three-story apartment building in a housing project located at the corner of Tully Street and Wells Avenue.  When he arrived at the scene at 9:19 p.m., Rewalt learned that the victim had already been transported to the hospital in critical condition, but he later learned that the victim had died.  Rewalt testified that while at the scene, he searched for evidence and took photographs, which were entered into evidence.  One photograph depicted blood stains, a bottle of Hawaiian punch, and a paper bag containing egg rolls and chicken wings.  At the crime scene, officers found two vehicles that were pertinent to their investigation, a 1997 Dodge Caravan and a 1976 Chevy Impala.  Rewalt dusted the Caravan for fingerprints after learning that a suspect "might have run into" the vehicle.  Rewalt testified that after leaving the scene of the crime, he delivered evidence to the property room and then proceeded to the hospital to collect the victim's clothing and personal effects.  According to Rewalt, "[t]en rocks" of "crack cocaine" were found on the victim's person, but no weapon was found.

Willie Wells testified that he knew the victim as "Junior Boy."  He stated that on March 30, 1999, the victim approached him at the corner of Tully Street and Wells Avenue at approximately 8:00 p.m. and asked to buy Wells' vehicle, the 1976 Chevy Impala later found at the scene. Wells testified that he allowed the victim to test-drive the car, and the victim then agreed to buy it.  Wells reported he and the victim arranged for the victim to give Wells $500 of the $1,500 asking price and that the victim would later give Wells the remaining $1,000.  Wells testified that he watched the

---

[1] The record does not contain a copy of the indictment charging the Defendant and the co-defendant with especially aggravated robbery.

-2-

victim count "a stack" of money while standing on the sidewalk near the car, and he then waited while the victim walked across the street to a store. He stated that when the victim exited the store holding a bag in his hand, the victim began to walk towards Tully Street. Wells stated that he next heard a gunshot and ducked. He maintained that he did not see who fired the shot.

On cross-examination, Wells testified that he saw ten to fifteen people, including a man named Leetoy Brown and a woman named Sharon Oliver, at the scene at the time of the shooting. Wells identified Oliver as a known drug user. He also testified that he made a statement to police concerning the shooting, but he maintained that he obtained much of the information in his statement from Oliver. He testified that he told police "from the beginning that everything [he told them was] hearsay," and he stated that much of the written statement was incorrect. Wells further testified on cross-examination that he picked the Defendant and the co-defendant out of photographic line-ups, but he claimed that he did so in response to being asked by police if he "had ever seen them in the neighborhood."

Dr. O.C. Smith, the Shelby County Medical Examiner, testified that in the spring of 1999, while employed as an Assistant Medical Examiner, he performed the autopsy on the victim in this case. Smith stated that at the time of his death, the victim was five feet, seven inches tall and weighed 163 pounds. Dr. Smith reported that the victim died as a result of a gunshot wound to the neck. Smith specified that the bullet that killed the victim severed several major arteries in the victim's neck, interrupting the blood supply to the victim's brain, and then crossed the victim's windpipe, causing the victim to inhale blood into his lungs. He stated that the weapon used to kill the victim was fired from a range of between twelve and twenty-four inches from the victim's body, leaving powder burns on the victim's skin. Dr. Smith further testified that he found "a series of skin scrapes or abrasions in the brow and cheek bone area" which were consistent with the victim's falling to the ground and striking a flat surface. Finally, Smith reported that tests performed on the victim's blood indicated no drug or alcohol content. However, Smith testified that a urine sample taken from the victim was "positive for a metabolite of cocaine, known as ecognine methyl esther, which is a chemical . . . produced when cocaine is broken down in the body."

Alexander O'Neil Blackmon, the victim's brother, testified that he spoke with the victim immediately prior to his death on the evening of March 30, 1999. He stated that after conversing with his brother, he walked to the store with Leetoy Brown. When he emerged from the store, he saw his brother standing across the street heatedly arguing with another male, and he then heard his brother call out to him that "he had drama." He explained that this meant that his brother was "having a confrontation with some guys." Blackmon recalled that as he turned and looked, he heard a gunshot. He stated that his brother was shot from the back and "hit the ground on his face." Blackmon testified that he saw the Defendant holding a gun standing over his brother after his brother fell. He stated that he also saw two women and the co-defendant standing near his brother. Blackmon testified that he next heard more gunshots, saw bullets hit a wall near where he was standing, and realized that the Defendant was shooting at him. He then began to run. Blackmon stated that he later got a ride back to the scene, where he saw his brother lying on the ground. He

testified that after returning to the scene, he went to his aunt's house and stayed there until his sister arrived to transport him to the hospital.

On cross-examination, Blackmon testified that he waited four weeks after the incident before speaking to police about the shooting. He also testified that he discussed the shooting with some of his family members and with Leetoy Brown prior to speaking to law enforcement officials. Blackmon explained the delay, stating, "I'm thinking that [the police] already had enough evidence to get [the Defendant and co-defendant] in custody. And I'm thinking that [the police] were going to come to me. I ain't hear [sic] nothing, so I had to step up."

Leetoy Brown testified that he had known the victim since childhood. He stated that on March 30, 1999, he went to the store with the victim's brother, Alexander Blackmon. Brown testified that when he and Blackmon exited the store, he saw the victim standing "in a huddle" with three other men. Brown stated that while he and Blackmon stopped to converse, the victim called out that he "got ana," meaning animosity, or "drama." When asked what "drama" meant, he stated, "They upset, just tripping off nothing." Brown reported that he then saw someone pull out a gun and shoot the victim, and the victim fell. According to Brown, after the victim fell, Brown was able to see more clearly. He testified that he then saw the co-defendant go into the victim's pockets and, at the same time, the Defendant begin shooting at Brown and Blackmon. Brown recalled that he "was stuck in a daze for a minute," but soon noticed Blackmon running and then began to run himself.

On cross-examination, Brown testified that the victim sold drugs and was carrying money on his person at the time of his death. Brown further testified that he had heard that Sharon Oliver was at the scene at the time of the victim's death. He reported that after the victim was shot, a "fight broke out" around the victim's body. He denied taking anything from the victim's body after the victim was shot. Brown stated that he bought a new car shortly after the victim's death. He explained that he obtained money for the purchase after police hit his previous car while it was parked. Brown admitted that he waited four weeks after the crime before sharing his knowledge of the crime with police, but he stated that he waited because he "was in fear for [his] life." Brown stated that he did not work, but sold drugs at the time of the crime. He admitted that every day he smoked "blunt[s]," which he described as marijuana inside a cigar, but denied ingesting any drugs immediately prior to witnessing the crime in this case. Finally, Brown testified that he picked the co-defendant out of a photographic line-up as one of the men involved in the shooting death of the victim. He admitted that he would be happy if the co-defendant were to be incarcerated for life.

Sharon Oliver testified that she had lived for ten years in the housing project where the crime occurred. She stated that she and the victim were friends and had grown up together. She recalled that on the evening of March 30, 1999, she "ran into" the victim at a store, where he was buying a "tropical punch drink." Oliver reported that the victim was also carrying a paper bag containing egg rolls and chicken. She stated that after they left the store, she and the victim went to Willie Wells' yard and talked with Wells about a vehicle that the victim wished to purchase. Oliver recalled that she and the victim later stopped to converse with some acquaintances at the housing project where

they lived. During their conversation, according to Oliver, the Defendant and the co-defendant, whom she knew "from around the neighborhood," approached the victim. Oliver testified that the Defendant said, "Hey man, ain't no dope selling in this building," and the victim responded, "Man, your name ain't on this building." According to Oliver, the Defendant replied, "Look man, I told you once ain't no M.F. dope selling in this building," and the victim then stated, "Man, you got me mixed up."

Oliver testified that after this discourse, the victim called across the street to his brother: "Hey Blackmon, I got drama." According to Oliver, the Defendant then pulled a gun out of his right back pocket and shot the victim from close range. The victim fell face-down. Oliver reported that the Defendant took five steps and then shot at the victim's brother. She recalled that she was initially "in a state of shock," but soon began to walk towards her grandmother's home. She stated that as she looked back at the crime scene, she saw the co-defendant reaching into the victim's left front pocket and the Defendant reaching into the victim's right front pocket. She then began to run, and the Defendant and the co-defendant ran together behind her. Oliver testified that the Defendant and co-defendant "fled" past her when she reached her grandmother's home. Oliver called 9-1-1 from her grandmother's home.

Oliver testified that later that evening, she went to the police station and provided the officers with a statement regarding the crime. She testified that between March 30 and April 6, 1999, she gave several statements to police. Oliver stated that she also identified the co-defendant from a photographic line-up as the person whom she saw reach into the victim's pocket after the victim had been shot, and she reported that she identified the Defendant from a photographic line-up as the shooter. Oliver maintained that there was no doubt in her mind that the Defendant shot the victim.

On cross-examination, Oliver admitted that when she first spoke to a police officer on the night of the crime, she told the officer that she did not witness the actual shooting. However, she explained that she did so because she "was scared for [her] life" and "didn't . . . really want to get involved." She stated, "I didn't know if [the Defendant] was going to come back and try to kill [m]e, or not. He was not incarcerated." Oliver testified that after the crime, her mother encouraged her to tell the police the truth because "a young boy's life [had] been taken." Oliver further testified that she did not initially tell police that she saw the Defendant and the co-defendant reach into the victim's pockets after the victim had been shot because she did not think that this information was important and because she was nervous.

Oliver testified that on the night of the crime, she spent the night at her mother's home. She stated that on the following night, she asked her friend, Anthony Bell, to spend the night at her apartment because she was afraid. Oliver testified that she told Bell everything she had seen and heard. Oliver further testified that she saw a man named Clifford Rogers at the scene, but that she did not see a man named Tony Retic at the scene on the night of the victim's death.

Oliver admitted on cross-examination that she had taken drugs for three to four years preceding trial, but she maintained that she did not "get high" every day. She reported that she last

"g[o]t high" four to five months prior to the trial. Oliver first testified on cross-examination that the victim had sold her drugs during the time period when she was taking drugs, but she later denied that the victim had ever sold her drugs. Oliver admitted that during the weeks surrounding the victim's death, she took drugs. She maintained, however, that she was "in [her] right mind" and did not take drugs on the night of the shooting.

Bonita Moore, an employee of Federal Express, testified that she was raised in the area where the shooting occurred, and she stated that the victim went to school with her children. Moore testified that at approximately 8:30 p.m. on the night of the crime, she was driving in her van at the intersection of Wells Avenue and Tully Street. She recalled that while she was stopped at a stop sign, she saw three men and a woman standing together near the intersection. Moore stated that she rolled the window down and was about to ask the group whether they had seen her son, who was being dropped off by a church bus. However, before she could speak, she heard two gunshots. Moore stated that she saw one of the men fall and the other two men bending over the man who had fallen. Moore testified that the woman "was standing like she was scared," but the woman then began to run. The men began to run together behind the woman. Thinking that the two men were going to shoot the woman, Moore followed the woman in her van. As Moore was turning into the back drive of the housing project where the shooting occurred, one of the men, whom Moore identified in court as the Defendant, ran into her van. According to Moore, the Defendant was holding "something red" and "a chrome object" in one of his hands. Moore stated that after the Defendant ran into her van, the other man yelled, "Man, let's go this way," and the Defendant ran away with him.

Moore testified that on the day following the crime, she gave a statement to police and identified the Defendant from a photographic line-up. She stated that she again identified the Defendant from a photographic line-up during the week after the crime. Moore testified that she did not know the Defendant, but knew of him from her children, who called him "Crazy Mike."

On cross-examination, Moore testified that the woman she saw on the night of the crime was Sharon Oliver, who was her niece. She stated that at the time of the crime, she did not recognize her niece, but discovered the following morning that Oliver was the woman she had seen. Moore testified that she and Oliver had a close relationship. Moore also testified that she did not realize at the time of the crime that the victim was the man whom she saw fall after the shooting.

Moore admitted on cross-examination that she did not tell police in her statement that she saw the two men bending over the victim after the victim had been shot. She stated that she answered questions asked by the officers and maintained that if the officers had asked her about this information, she would have shared it with them. She also maintained that Oliver never told her that the men reached into the victim's pockets.

Co-defendant Joseph Flake called Eugene L. Milner, a private investigator, to testify on his behalf. Milner testified that he was retired from the Memphis Police Department and had been working for Investigations Unlimited for eight years. He stated that during his twenty-five years with

the Memphis Police Department, he had worked on the homicide squad and had prepared numerous crime scene reports. Milner also stated that he had examined the crime scene reports in this case.

Milner testified that he visited the crime scene and measured various distances there. He stated that he visited the scene at night and stood at the spot from which witnesses viewed the crime. He reported that the view from that spot was "dim" and stated that although there were street lights in the area, it was "dark." He further reported that a large tree stood in the area.

Milner testified that he had interviewed Sharon Oliver, who told him that she had known the victim and his family for several years and that she loved them. According to Milner, Oliver also told him that she had bought drugs from the victim. Milner testified that Oliver informed him that several months prior to their interview, the co-defendant had threatened her brother "because a known dope dealer by the name of Ronnie Vaughn . . . had told him to." Milner stated that Oliver was "glad" that both the Defendant and the co-defendant "were out of the neighborhood."

Sergeant Sylvia S. Owen of the Memphis Police Department also testified on co-defendant Flake's behalf. She stated that she was a sergeant in the area of domestic violence and reported that she participated in the investigation of the crime scene in this case on March 30, 1999. Owen testified that she interviewed Willie Wells, Jr., Sharon Oliver, Shaquanta Nelson, and Bonita Moore on that date.

Anthony Bell testified that he was incarcerated at the time of trial for trespassing and disorderly conduct. He stated that he knew Sharon Oliver and that on March 31, 1999, Oliver told him that a man with whom she had grown up had been shot by "some dude named Michael." According to Bell, Oliver said that on the night of the crime, the victim and Michael were talking, the victim called across the street to his brother "that he was having some problems," and Michael then shot the victim. Bell stated that Oliver did not mention the co-defendant. She also told Bell that only she, the victim and Michael actually knew what happened "because everybody else was too far off to see what had happened." Bell testified that he had been released from jail on the day the victim was shot, and he stated that after Oliver was interviewed by police about the crime in this case, she asked Bell "to come over to her apartment and stay with her for awhile, because . . . she was scared to stay there . . . ." Bell testified that he stayed at Oliver's apartment that night and the following night. He further testified that he stayed with Oliver on and off for a while after March 31, 1999.

Bell testified that during this time period, Oliver was smoking "primo joints," which he described as either "weed and crack [cocaine] crunched up together . . . in cigarette paper" or a cigarette containing cocaine. Bell specified that the majority of the time that he was around Oliver during this period, she was "getting high." Bell stated that on the night after he left Oliver's apartment, he returned to her apartment, where several people were smoking marijuana; he stated that at this time, no one was ingesting cocaine. Bell admitted that he also smoked "crack" cocaine, but he maintained that the drugs did not affect his memory.

-7-

Bell stated that he learned of co-defendant Flake's involvement in the crime when he and the co-defendant were incarcerated together. Bell testified that the co-defendant approached him and asked Bell to "talk to [Oliver], because she had him [in jail] on a murder charge." Bell testified that he told the co-defendant that Oliver "didn't tell [him] that."

Twenty-year-old Montonya Retic testified that he was at the crime scene when the crime occurred. He testified that he was conversing with the Defendant, who "was kind of angry about something." He stated, "We was [sic] having a discussion about the situation of money in the area and him holding money and him having money, and I offered to lend him some." Retic testified that the Defendant refused his offer because he needed more money than Retic could lend him. Retic stated that while he and the Defendant were talking, co-defendant Flake approached and greeted them. He testified that they then walked to a nearby store to buy beer and cigarettes and returned to the scene.

Retic recalled that as he, the Defendant, and the co-defendant opened their beers, Sharon Oliver, whom Retic described as a "junkie," approached them. According to Retic, Oliver asked them for "crack," and Retic sold her some. Retic stated, however, that the victim then approached the group, and Oliver decided that she would rather buy drugs from the victim. She therefore returned the drugs bought from Retic, and Retic refunded her money. Retic stated that Oliver then purchased cocaine from the victim. Retic testified that several people were standing nearby at this point.

Retic recalled that the Defendant's beer disappeared while they were talking, and the Defendant became "really angry." However, according to Retic, a woman named Renee approached the Defendant, offered to buy him another beer, and then walked to the store to buy a beer for the Defendant. Retic testified that the Defendant and the victim next began to argue "over where [the victim] could distribute his crack, his drugs." Retic stated that during the argument, the victim "had tied his drugs up, and he reached in his pants," while "scream[ing]" to his brother across the street "we got ana, we got drama . . . ." Retic testified that at this point, the Defendant shot the victim and then shot two or three times toward the victim's brother. He stated that the Defendant then walked to the victim's body, appeared to "search[]" the victim, and put something into his own pocket. Retic maintained that the Defendant had to have taken money from the victim because the victim would not have carried drugs in his pockets where police would easily be able to find them. Retic stated that at this point, Oliver had run from the scene, thinking that someone was shooting at her. Retic testified that after going through the victim's pockets, the Defendant turned to Retic and said, "Run." Retic reported that he, the Defendant, and the co-defendant ran from the scene. He stated that when they reached Oliver, who had stopped running, she said, "[y]'all shouldn't have done that . . . ."

Finally, Retic testified that Leetoy Brown, who was also at the scene on the night of the crime, remained near the victim's body after he, the Defendant, the co-defendant, and Sharon Oliver had fled. Retic stated, "He was too close to the body. . . . [H]e was looking at the body, but he wasn't checking it like he was trying to get any help. He was just standing there." He testified,

"[A]fter everything had died down, [Brown] had popped up, he had a car, gold teeth, about six of them, he had a lot of dope and money." Retic theorized that Brown must have taken drugs from the victim's body because police found only "ten rocks" on the victim's body. Retic maintained that the victim, who carried more drugs than any other dealers in the area, "was not known to carry just ten rocks."

Retic reported that the co-defendant did not touch the victim's body. He explained that the co-defendant had a job as a manager at a business and was trying to help Retic get a job at the time of the crime. He admitted, however, that the co-defendant had "changed from how he had been" and that the co-defendant had pointed a shotgun at him in the past. Finally, Retic admitted that at the time of the crime, selling drugs was the source of his income. He admitted that co-defendant Flake and Flake's attorney had gotten him involved in the case.

The Defendant called Clifford Rogers to testify on his behalf. Rogers testified that on March 30, 1999, he was at the scene of the crime. Rogers reported that he saw Oliver trying to buy cocaine from the victim when he ran into them. He claimed that he, the victim, and Sharon Oliver walked together across the housing project immediately prior to the crime. Rogers stated that the three of them then approached the Defendant, who was standing at the ramp to one of the apartment buildings, and Rogers entered into an argument with the Defendant about the Defendant's selling him "some bad dope." Rogers testified that the Defendant told the victim "that he would appreciate it" if the victim did not sell drugs around the Defendant. According to Rogers, an argument between the Defendant and the victim ensued. During the argument, the victim "hollered across the street" to his brother that he had "drama," and the victim then "put[] something in his pants." However, Rogers stated that before the victim could "g[e]t his hands out" of his pants, the Defendant shot the victim.

Rogers reported that Sharon Oliver was "[g]one on the first shot," but he recalled that he remained where he was standing, looking at the body. Rogers stated that when he left, the Defendant was still at the scene. However, he maintained that he saw no one, including the Defendant, reach into the victim's pockets. He also testified that no one was at the scene of the crime except him, the Defendant, and Sharon Oliver. Rogers maintained that if the co-defendant was at the scene, Rogers never saw him.

On cross-examination, Rogers testified that it appeared that the victim may have been drawing a weapon when he reached inside his pants immediately prior to being shot. Rogers stated, "To my knowledge, that's the way I seen it." However, Rogers admitted that the victim had only "dope" in his hands when he was shot.

The Defendant testified on his own behalf at trial. He recalled that at approximately 8:30 p.m. on the evening of March 30, 1999, he was standing outside of a housing project building near Tully Street and Wells Avenue. He testified that co-defendant Flake, who had just come from the store, stopped there to speak to him. The Defendant stated that while he was talking to the co-defendant, he saw the victim, Sharon Oliver, and Clifford Rogers walking across the street towards

-9-

them.  The Defendant reported that the victim "was fixin' to transact [s]ome drug dealing in front of [him]," and the Defendant requested that the victim refrain from selling drugs "in front of [the Defendant]."  According to the Defendant, the victim replied, "This building ain't got your mother f__king name on it."  The Defendant testified that he waited a moment and then said, "Well, just don't do it like that, right here," to which the victim responded, "Who in the hell do you think you is? . . . You don't own nothing."  At this point, an argument ensued, during which the Defendant and the victim were "cussing at each other."  The Defendant testified that during the argument, the victim "turned his back on" the Defendant and called to his brother across the street, "Little Black, I got drama with these weak ass niggers, again."  The Defendant explained that this "means you got a problem, you need to solve it."  According to the Defendant, the victim then reached in his pants.  The Defendant maintained that he believed the victim was reaching for a gun to shoot him.  He explained, "I know what type of guy [the victim] is.  I been knowing him for quite a while.  I know that he's known for selling drugs.  I know that he's known for carrying pistols.  And I know that he will use it."  The Defendant stated that he therefore shot the victim before the victim could turn all the way around.  The Defendant insisted that he did so because he feared for his life.

The Defendant testified that he next saw two "more shouters coming across the street in the dark," so he shot at them as well.  He explained that he shot at the two men coming across the street because he "knew they was coming to help [the victim] do something to" him.  The Defendant testified that after he fired the shots, he and the co-defendant ran from the scene.  He denied that co-defendant Flake had any involvement in the shooting.  The Defendant also denied reaching into the victim's pockets after shooting the victim, and he stated that he did not see anyone else reach into the victim's pockets.

On cross-examination, the Defendant testified that on the night of the crime, he was carrying a loaded .357 magnum revolver in his back pocket.  He admitted that he had argued with both the victim and the victim's brother before the night of the crime.  He also admitted that he and the victim had engaged in a physical altercation in 1994 or 1995.  He testified that he thought the victim's brother carried a gun.  Finally, the Defendant testified that at the time of the crime, he was selling marijuana.

### III.  ANALYSIS
### A.  Sufficiency of the Evidence

The Defendant contests the sufficiency of the evidence.  Specifically, he contends that "the State has failed to carry its burden of proving . . . that the killing of the victim was without passion produced by adequate provocation."  The Defendant thus argues that his conviction should be modified from second degree murder to voluntary manslaughter.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698

S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of second degree murder, which is defined, in pertinent part, as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). As to the "knowing" mental state, the State must prove beyond a reasonable doubt that the defendant was aware that his conduct was reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

Having reviewed the record, we conclude that ample evidence was presented at trial to support the Defendant's conviction for second degree murder. Witnesses to the shooting testified that the Defendant and the victim engaged in a somewhat brief argument about drug dealing and that during the argument, the victim called across the street to his brother. Witnesses testified that immediately afterwards, the Defendant pulled out his gun and shot the victim from close range. Evidence was presented that the victim was not armed at the time of the shooting. The Defendant himself testified that he was carrying a loaded gun in his pocket on the night of the crime, and he claimed that he was familiar with the victim's reputation for violence, which prompted him, in part, to shoot the victim before the victim could turn around. This is sufficient evidence from which the jury could conclude that the Defendant was aware that his conduct on the night of the crime was reasonably certain to cause the victim's death.

Although the defense presented evidence that the Defendant acted in self-defense, two witnesses and the Defendant himself testified that the Defendant shot the victim while the victim's back was turned. Witnesses reported that the victim fell face-first onto the ground. Autopsy results, indicating abrasions on the victim's face, support this scenario. The jury ultimately rejected the Defendant's claim of self-defense, and the jury also ultimately rejected the notion of adequate provocation in this case. Whether the Defendant acted in self-defense and whether he was

adequately provoked were proper questions of fact for consideration by the jury. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App.1997); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Furthermore, we may not reevaluate the evidence presented at trial. See Matthews, 805 S.W.2d at 779. Because we find sufficient evidence to support the jury's verdict in this case, we conclude that this issue is without merit.

## B. Supplemental Jury Instructions

The Defendant next argues that the trial court supplied the jury with improper supplemental instructions. Generally, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Our supreme court, relying on the words of the United States Supreme Court, has noted that

> "jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."

Id. (quoting Boyde v. California, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id.

The record reveals that after the jury in this case retired to deliberate, it submitted several written questions to the trial judge. The first question was as follows: "If the first two questions under murder second and voluntary manslaughter is [sic] the same, how can we prove a person gets voluntary manslaughter if we agreed to the first two questions under murder second?" After receiving this question, the trial judge called the jurors back into open court and responded to the question as follows:

> The first two elements of voluntary manslaughter – I'm just going to read through this charge here, just a minute.
> "That the defendant unlawfully killed the alleged victim and (two) that the defendant acted intentionally or knowingly".
> Okay. Now there's a third element to voluntary manslaughter, which is that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.
> Now, rather than commenting on the first two elements, what I'm going to say is, if you find from the proof that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner, then you cannot convict of murder in the second degree.
> That third element lessons [sic] the offense and drops it down. And this is different from the other offenses, because in the other offenses you have all these elements and as they're removed the offense drops down. But, the fact that if the

-12-

killing resulted from the state of passion, that's different in that it lessons [sic] the charge.

And that, I think, is the only crime that I can tell from all of our charges that does that. And you're the first jury that's ever picked up on that and asked the question about it. So I've learned something from your question.

Usually like, in another case, additional elements proved increase the charge, but in homicide if the killing resulted from adequate provocation that produced a state of passion sufficient to lead a reasonable person to act in an irrational manner, that would reduce the offense from murder second degree, if the other elements have been proved, to a voluntary manslaughter. And I hope that answers your question.

Okay. So that's all I can tell you at this time. If you find from the proof that all the elements of murder second degree have been proven beyond a reasonable doubt and if you find that all the elements of voluntary manslaughter have been proven beyond a reasonable doubt, then you cannot convict of murder second. Because that third element about adequate – state of passion, producing adequate provocation would negate murder second and turn it into voluntary manslaughter.

Following this, the jury returned to deliberations. The jury then submitted three more questions for the court's review. The jury first asked, "Under voluntary manslaughter element three, is there a lawful definition of adequate provocation? Example, if there's some provocation that is adequate?" In response to this question, the trial judge, relying on a definition from the revised fourth edition of Black's Law Dictionary, stated, "First I want to tell you, that's a jury question. I can't answer that for you, because I can't comment on the evidence. But, I'm going to give you a written definition here as part of your charge. . . . 'Adequate provocation is one that excites such anger as might obscure the reason or dominate the volition of an ordinary reasonable man.'"

The jury next asked, "Is there a lawful definition for a reasonable person?" Finally, the jury asked, "Under voluntary manslaughter, element three, does a reasonable person refer to the defendant, or is it a general term defining adequate provocation. Will you define what 'reasonable person' means here?" The trial judge, relying on a definition from Webster's Third International Dictionary, responded to these two questions as follows:

Reasonable person refers to the defendant. And your question is whether or not, if you find beyond a reasonable doubt, the defendant unlawfully killed someone, the question is . . . whether or not there was adequate provocation that if that defendant were a reasonable person, would there be adequate provocation to lead them to act in an irrational manner.

So you use the reasonable person standard.

I'm going to define reasonable to you, but not reasonable person. I'm going to define the word, reasonable, and then you apply that to person.

"Reasonable means being in right thinking, or right judgment not absurd, not ridiculous, not extreme, not excessive. Possessing good sound judgment, well balanced and sensible."

-13-

The Defendant first argues that the trial court's answer concerning the definition of "reasonable person" "misstated the law and was confusing." In his brief, the Defendant states, "There is a reasonable likelihood that the jury interpreted the trial judge's supplemental instruction as excluding from the jury the possibility that a 'reasonable person' could kill in a state of passion produced by adequate provocation, . . . or, at the least, the instruction set too high a standard of reasonableness for the law of voluntary manslaughter." In other words, the Defendant contends that the definition provided by the trial court may have led the jury to conclude that because the Defendant's actions were unreasonable in the context of self-defense, they were also unreasonable in the context of voluntary manslaughter.

As the State points out in its brief, however, the original instructions to the jury contained an instruction on self-defense. The portions of that instruction concerning "reasonable" in the context of self-defense are as follows:

> When a person is assaulted by the use of force, or attempted use of force, in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of death, or serious bodily injury, he will be justified in using force to defend himself, even to the extent of killing another human being.
>
> The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the others [sic] use of unlawful force.
>
> The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time and must be founded upon reasonable grounds.
>
> A person may have been mistaken based on his perception of the circumstances as to the extent of the actual danger, but if he acts in self defense from honest, even though mistaken convictions, as to the extent of danger, he will not be held criminally liable for his action.
>
> In determining whether the defendant's use of force in defending himself was reasonable you may consider not only his use of force, but also all the facts and circumstances surrounding and leading up to it.
>
> Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death, or serious bodily injury from the alleged victim, include but aren't limited to any previous threats of the alleged victim, made known to the defendant. The character of the alleged victim for violence, when known to the defendant. The animosity of the alleged victim for the defendant, as revealed to the defendant by previous actions and words of the alleged victim. And the manner in which the parties were armed and their relative strengths and sizes.
>
> If you find that the defendant's fear of death or serious bodily injury was genuine and reasonable under the circumstances, then he would of had [sic] the right to use as much force as was apparently necessary in his own self defense.
>
> If on the other hand you find the defendant was not genuinely, or reasonably fearful of death, or serious bodily injury, or that he used force going beyond the real or apparent necessity for his own defense, then his use of force would not have been justified.

-14-

A trial court may respond to jury questions with a supplemental instruction. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). Moreover, when confronted with questions from the jury regarding the definition of legal terms, it is appropriate for a trial court to provide a jury with supplemental instructions after consultation with counsel. State v. Pamela Sue King, No. M2000-00148-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 880, at *19 (Tenn. Crim. App., Nashville, Nov. 9, 2001). Noting that neither statutory law nor the Tennessee Pattern Jury Instructions provide a definition of "reasonable person" and citing the American Heritage Dictionary and Webster's New World Dictionary, this Court has approved such terms as "ordinary, usual, . . . rational . . . moderate, fair, and sensible" as adequate definitions of "reasonable person." State v. Maria Maclin, No. 02C01-9710-CR-00383, 1998 Tenn. Crim. App. LEXIS 877, at **6-7 (Tenn. Crim. App., Jackson, Aug. 21, 1998).

We conclude that the trial court's supplemental instruction in this case defining "reasonable" as "right thinking, or right judgment not absurd, not ridiculous, not extreme, not excessive[;] [p]ossessing good sound judgment, well balanced and sensible" was not prejudicially erroneous. Rather, it was an adequate and appropriate definition. It did not serve to mislead the jury as to the applicable law, nor did it fail to fairly submit the legal issues. See Hodges, 944 S.W.2d at 352. Furthermore, we agree with the State's contention that the fact that the jury was provided an instruction on self-defense and "asked specifically about a reasonable person in the context of voluntary manslaughter, indicates that the jury did not confuse the two." We thus conclude that the trial court did not err in providing a supplemental instruction to the jury concerning the definition of "reasonable person."

The Defendant next argues that the definition of "adequate provocation" provided by the trial court to the jury in its supplemental instructions was "erroneous and incomplete." As previously stated, the trial court instructed the jury that "[a]dequate provocation is one that excites such anger as might obscure the reason or dominate the volition of an ordinary reasonable man." The Defendant argues that "the trial judge erroneously substituted the word 'anger' in place of the statutory word 'passion' . . . ." However, the fourth edition of Black's Law Dictionary defines "adequate provocation" as follows: "An adequate provocation to cause a sudden transport of passion that may suspend the exercise of judgment and exclude premeditation and a previously formed design is one that is calculated to excite such anger as might obscure the reason or dominate the volition of an ordinary man." Black's Law Dictionary 39-40 (4th ed. 1990) (emphasis added). We conclude that the definition of "adequate provocation" provided to the jury was appropriate.

Finally, the Defendant contends that the trial court erred by failing to instruct the jury not to place undue emphasis on the supplemental instructions. This Court has stated that "[w]hile the better procedure is to admonish the jury not to place undue emphasis on [a] supplemental instruction and to consider it in conjunction with the entire charge, it is not necessarily reversible error to fail to do so." Forbes, 918 S.W.2d at 451. To determine whether the trial court's failure to provide such a limiting instruction was reversible error, we must consider the entire record. See Burton v. State,

394 S.W.2d 873, 876 (Tenn. 1965); State v. Chance, 778 S.W.2d 457, 461 (Tenn. Crim. App. 1989).

Although the trial court did not offer a limiting instruction concerning the supplemental instructions, as is the preferred practice, we note that the court included this instruction in its original jury instructions:

> The law applicable to this case is stated in these instructions and it is your duty to carefully consider all of them. The order in which these instructions are given, is not an indication of their relative importance. You shouldn't single out one or more of them to the exclusion of another, or others, but should consider each one in the light of and in harmony with the others.

Considering this instruction and the record as a whole, we conclude that the trial court did not commit reversible error by failing to instruct the jury not to place undue emphasis on the supplemental instructions.

## C. Comments on the Evidence

In a final assignment of error, the Defendant contends that the trial court impermissibly commented on the evidence in its supplemental instructions to the jury. The Tennessee Constitution mandates that "[j]udges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." Tenn. Const. art. VI, § 9; see also State v. Odom, 928 S.W.2d 18, 32 (Tenn. 1996). The Defendant specifically argues that the trial court "'assumed' from the jury's first question that [it] had found the defendant guilty of all elements of second degree murder" and implied that it agreed with this assessment. The record indicates, however, that the trial court merely declined to comment on the first two elements of second degree murder and focused its response instead on the element differentiating the crime of voluntary manslaughter from second degree murder. The court's response was appropriate, given that the jury's question did not concern the first two elements of second degree murder. The court also specifically stated in its supplemental instructions: "If you find from the proof that all the elements of murder second degree have been proven beyond a reasonable doubt and if you find that all the elements of voluntary manslaughter have been proven beyond a reasonable doubt, then you cannot convict of murder second." (Emphasis added). We conclude that these comments were not improper, and we find no other instance in the record when the trial court improperly commented on the evidence.

Accordingly, we AFFIRM the judgment of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE